**In re GOLDBLATT BROS., INC., Debtor.**

**UNSECURED CREDITORS' COMMITTEE OF GOLDBLATT BROS., INC., Plaintiff,**

**v.**

**UNITED STATES of America (DEPARTMENT OF TREASURY, INTERNAL REVENUE SERVICE), and State of Illinois (Department of Revenue), Defendants.**

**Bankruptcy No. 81 B 7075.
Adv. No. 88 A 302.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Oct. 10, 1989.

6. It is not necessary to address the plaintiff's contentions under 11 U.S.C.A. §§ 547 or 549.

Steven R. Radtke, Chill, Chill & Radtke, P.C., Chicago, Ill., for plaintiff.

James Newbold, Sp. Asst. Atty. Gen., Revenue Litigation Div., Chicago, Ill., for State of Ill.

Richard M. Prendergast, Trial Atty., Tax Div., .U.S. Dept. of Justice, Washington, D.C., Lauren Gore, Dist. Counsel's Office, I.R.S., Chicago, Ill., for U.S.

## MEMORANDUM OPINION ON DEFEN- DANTS' MOTIONS TO DISMISS

JACK B. SCHMETTERER,
Bankruptcy Judge.

On June 15, 1981 Goldblatt Bros., Inc. (the "Debtor") filed its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq. By order of August 23, 1983, the Debtor's Second Amended Plan of Reorganization (the "Plan") was confirmed. The Plan provided in part for creation of a bank account, the "Creditors' Deposit Account" (the "CDA"), to be administered by the Unsecured Creditors' Committee of Goldblatt Brothers, Inc. (the "Committee"). The Plan provided that the CDA is to be used to pay certain administrative and priority claims in full and to pay pro rata those parties holding general unsecured nonpriority claims ("Class 3 Allowed Claims").[1] Following confirmation of the Plan, the CDA was created and funded. On April 22, 1988, the Committee filed the instant Adversary Complaint against both the United States, Department of Treasury, Internal Revenue Service (the "United States") and the State of Illinois, Depart- ment of Revenue ("Illinois"). The Com- plaint seeks declaratory judgment that the Committee is not responsible for paying federal or state income tax on interest earned on money held in the CDA, or for filing federal or state income tax returns related to this fund.[2]

The United States and Illinois (collective- ly "the Movants") each moved to dismiss the complaint. Movants contend that a bankruptcy court lacks jurisdiction to adju- dicate the Committee's federal and state income tax responsibilities regarding the CDA. For reasons stated below, those mo- tions are denied.

### Undisputed Facts

To evaluate Movants' arguments, it is first necessary to consider attributes of the CDA as set forth in the confirmed Plan. The Plan defined the CDA as "[t]he bank account to be established pursuant to Sec- tion 2 of Article V of the Plan." Section 2, Article V in turn provided that as soon as practicable following confirmation, Debtor was to deposit the [specified sum] into the Creditors' Deposit Account to be estab- lished in the name of the Committee at Exchange National Bank. The Plan explic- itly provided that "[o]n the Deposit Date, all obligations of [Debtor] ... with refer- ence to Class 3 Allowed Claims shall be fully settled, satisfied and discharged as of the Confirmation Date." Art. IV, § 1.

Once Debtor funded the CDA, the ongo- ing duty of administering those classes of claims to be satisfied out of the CDA shift-

---

1. The Plan also provided for creation and fund- ing of the Goldblatt Deposit Account. That ac- count was also funded by the Debtor and ad- ministered by the Committee to pay in full pri- ority tax claims, certain priority claims related to the employee benefit plan under 11 U.S.C. § 507(a)(4), and certain use and occupancy claims. Unlike the CDA, any excess funds in the Goldblatt Deposit Account revert to the Debtor. The Debtor has apparently assumed responsibil- ity for any tax consequences resulting from this account and the Committee has not raised any issue as to appropriate tax treatment of the Goldblatt Deposit Account in its declaratory judgment action.

2. The statutory authorization for federal declar- atory judgments, 28 U.S.C. § 2201, provides:
   [I]n a case of actual controversy within its jurisdiction, *except with respect to Federal tax- es* other than ... *a proceeding under section 505 ... of title 11,* any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interest party seeking such declaration, whether or not further relief is or could be sought.
   As found below, jurisdiction exists within 11 U.S.C. § 505. Therefore, the general rule against rendering declaratory judgments in cases involving federal income taxes is inappli- cable.

ed from Debtor to the Committee. The Plan stated that "[t]he Committee shall survive the confirmation of the Plan and continue to function in accordance with the authority and obligations provided under the Plan until all sums on deposit in the Deposit Accounts are finally distributed." Art. VII, § 1. These functions are fleshed out in Article V, § 2, which provided in part:

> *Subject to the continuing jurisdiction of the Court,* the Committee is hereby authorized to administer the [CDA] for the sole benefit of those [creditors] whose claims are payable out of the CDA ... and in that connection, *the Committee shall have the authority* (i) subject to approval of the Court, to retain additional counsel to discharge its responsibilities under this Section, (ii) to review the claims scheduled by or filed against [the Debtor] in this case which are payable out of the [CDA] in order to determine the extent, if any, to which each such claim shall be an Administrative Claim or an Allowed Claim, as the case may be, (iii) *to contest all or any part of any claim payable out of the [CDA]* provided, however, that all objections to such claims shall be filed with the Court within 120 days after the Deposit Date, or as soon as practicable thereafter. . . .

(emphasis added). The Plan thereby assigned to the Committee the responsibility for evaluating, contesting and administering claims "payable out of" the CDA, all under this Court's jurisdiction.

For the first 120 days following deposit of money into the CDA, Debtor was required to furnish the Committee with all information it had relevant to claims, and to make its personnel available for depositions and testimony on such matters without charge. Article V, 2. Upon completing its review of claims filed against the Debtor, the Committee was and remains required under the Plan to make payouts to the different classes of creditors entitled to payment from the CDA. Art. IV, § 1; Art. V, § 2(v)-(vii). Those classes include certain administrative claims allowed under 11 U.S.C. § 503(b), certain priority claims involving pre-petition wages under 11 U.S.C.

§ 507(a)(3), (5), the Committee's reasonable expenses incurred in administering the CDA, and the Class 3 Allowed Claims. *Id.* In the interim period between funding and payout, the Committee is required to invest the CDA funds in "readily marketable obligations" of the United States or in certificates of time deposits issued by certain banks. Art. V, § 5. Earnings therefrom become part of the CDA. Should the earnings be taxable, the Committee would be obliged to pay such taxes out of the CDA as expenses incurred in administering the CDA.

The confirmed Plan has been implemented essentially as required. In mid-August of 1985 the Debtor deposited approximately $7 million in the CDA. Shortly thereafter, an initial distribution of $3 million was dispersed to those creditors with allowed claims against the CDA. The Committee now represents that all claims evaluation has been completed, and that administrative and priority claims have been paid in full. About $5 million remains in the CDA to be distributed *pro rata* to creditors holding Class 3 Allowed Claims upon resolution of the present tax dispute. The Committee is withholding final distribution of this sum in order to avoid any possible subsequent imposition of penalties and potential personal liability on Committee members or their attorneys. Neither the United States nor Illinois has filed a claim in bankruptcy against the Debtor, Committee, or CDA related to the post-confirmation interest earned by the CDA.

It appears that substantial interest has accrued on the money invested in the CDA. Neither Debtor nor the Committee has filed a federal or state income tax return or paid federal or state income tax with respect to such interest. The Plan does not specifically address such possible taxes or the filing of such returns.

### Analysis

1. *Subject Matter Jurisdiction under 11 U.S.C. § 505(a)(1) and 28 U.S.C. § 157*

The government Movants focus on the jurisdictional grant set forth in 11 U.S.C.

§ 505. Section 505(a)(1) provides in part that "the court *may* determine the amount or legality of *any tax*, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." (emphasis added). Movants point out that the broad language of § 505(a)(1) has been interpreted by recent case law to authorize a bankruptcy court to determine only the tax liability of a debtor under Title 11 U.S.C., but not that of other parties. Movants argue that the Committee and CDA comprise an entity distinct from Debtor because Debtor's liability to its general unsecured creditors was discharged under the Plan when it deposited funds in the CDA. Therefore, they reason that this Court lacks subject matter jurisdiction under § 505(a)(1).

This Court concludes, however, that § 505's specific jurisdictional grant should not be read in isolation from general statutory provisions authorizing bankruptcy courts to adjudicate controversies. Accordingly, we turn first to those general jurisdictional provisions.

Original jurisdiction over bankruptcy is conferred on federal district courts under 28 U.S.C. § 1334. This section provides for exclusive original jurisdiction in federal district court over cases filed under Title 11 U.S.C. and nonexclusive original jurisdiction for proceedings (1) arising under Title 11, (2) arising in cases under Title 11, and (3) related to cases under Title 11. Although a proceeding falling within any one of the foregoing categories is sufficient to vest the district court with subject matter jurisdiction, the distinction between "arising under" and "arising in" on one hand and "related to" cases on the other is relevant to determine the authority of a bankruptcy court to adjudicate the proceeding and enter final enforceable orders.

This distinction is set forth in 28 U.S.C. § 157 which was enacted in response to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).[3] *Marathon* held that the referral of the district court's entire subject matter jurisdiction to non-article III decision makers under 28 U.S.C. § 1471(c) [the predecessor to § 157] was unconstitutional.[4]

Section 157 provides in part that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 ... and may enter appropriate orders and judgments...." 28 U.S.C. § 157(b)(1). A bankruptcy judge may also hear "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." However, in "related to" proceedings, unless the parties otherwise consent, the bankruptcy court is only empowered to propose findings of fact and conclusions of law that are submitted to the district court for *de novo* review. *Id.* at § 157(c)(1), (2).

Accordingly, in the absence of any provision expressly excluding federal and state income taxation from the adjudicative power of bankruptcy courts, determination of whether a bankruptcy court can adjudicate tax issues would be evaluated under § 157 standards like any other jurisdiction issue. If the tax dispute involved a core controversy, then a bankruptcy court could enter final enforceable orders. If the tax dispute was only "related to" the case under title 11 the bankruptcy court could submit proposed findings of fact and conclusions of law. If neither of those tests were satisfied, then the bankruptcy court would not have jurisdiction to hear the case at all.

**3.** Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, *reprinted in* 1984 U.S.Code Cong. & Admin.News 98 Stat. 333, 333–346.

**4.** Section 1471(c) of Title 28 U.S.C., repealed in 1984, provided that "[t]he bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by [§ 1471(a), (b)] on the district courts." Section 1471(a), (b) were essentially identical to 28 U.S.C. § 1334(a), (b). Section 1471(c) therefore authorized bankruptcy courts to adjudicate and issue final judgments in "related to" cases as well as "arising in" and "arising under" cases.

■ The Court concludes that the tax disputes in issue here are core proceedings. The term "core proceeding" is not defined in the Bankruptcy Code, but § 157(b)(2) enumerates a nonexclusive list of examples, including matters concerning the administration of the estate, allowance or disallowance of claims against the estate, and confirmation of plans. *See* 28 U.S.C. § 157(b)(2)(A), (B), (L).

The CDA account was created as an integral part of the Debtor's confirmed plan. Entrustment of the CDA and assignment of the claims review function to the Committee clearly expedited the Debtor's reorganization and emergence from Chapter 11. The CDA provided a vehicle through which the process of allowing and disallowing claims could be conducted efficiently. This process assures that creditors receive their proper share of the former Debtor's bankruptcy estate. These functions are at the heart of the bankruptcy process. Further, the CDA's existence is inextricably tied to the reorganization effort; when the processing and distribution of claims are completed, the CDA will be closed. There is no question that this Court retained jurisdiction to resolve contested claims against the CDA even though Debtor's duties were discharged after it funded that account. Section 1142 of the Bankruptcy Code specifically provides that "the debtor *and any entity organized or to be organized for the purpose of carrying out the plan* shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142. (Emphasis supplied.) An "entity" under the Bankruptcy Code "includes" a "person", and therefore includes the group of persons comprising the Committee in this case. 11 U.S.C. § 101(14). *See also* Bankruptcy Rule 3020(d) ("Notwithstanding the entry of the order of confirmation, the court may enter all orders necessary to administer the estate"); 11 King, *Collier on Bankruptcy*, ¶ 1142.01[1] (15th ed. 1989) (bankruptcy court retains jurisdiction over matters arising under title 11 or in a case under title 11 as long as case is open notwithstanding issuance of order of confirmation). Similarly, a "representative of the estate" may be provided by confirmed Plan to pursue a claim of the estate. Cf. *In re Sweetwater (Citicorp v. Robison)*, 884 F.2d 1323 (10th Cir.1989.)

Income on funds held in the CDA has been earned post confirmation while administration of the CDA has been under jurisdiction of this Court. The CDA was created to carry out the Plan. To the extent that any state or federal tax would be due on CDA income, the pro rata cash distribution due to creditors holding Class 3 Allowed Claims under the Plan would be directly reduced. It is therefore clear that issues as to taxability of income earned on funds held in the CDA is within this Court's core jurisdiction to administer the estate and implement the confirmation process. *See In re Wood*, 825 F.2d 90, 97 (5th Cir.1987) ("a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."). *See also, In re Denalco Corp.*, 57 B.R. 392, 394 (N.D.Ill.1986).

The foregoing analysis only addresses 28 U.S.C. § 157. A more difficult problem is posed by our need to determine how 11 U.S.C. § 505(a)(1), which specifically addresses jurisdiction of bankruptcy courts in tax matters, impacts § 157 which addresses the general jurisdiction of bankruptcy courts to adjudicate different categories of issues. Little authority has been found that specifically discusses the relationship between § 505(a)(1) and § 157. This issue is further complicated by the fact that § 505(a)(1) pre-dates § 157.[5]

Some prior authorities have addressed the taxability of interest earned on funds created pursuant to confirmed plans. However, those courts implicitly assumed that a bankruptcy court has subject matter jurisdiction over such proceedings without

---

**5.** Section 505 was enacted as part of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, *reprinted in* 1978 U.S.Code Cong. & Admin. News, 92 Stat. 2549. As noted earlier, § 157 was enacted as part of Bankruptcy Amendments and Federal Judgeship Act of 1984. *See supra* note 3.

addressing the I.R.S.'s argument now before this Court that jurisdiction under § 505 is confined to determining tax liability of the debtor. *See In re Holywell Corp.*, No. 88–0795–Civ.–Kehoe (S.D.Fla. July 31, 1989); *In re Sonner*, 53 B.R. 859 (Bankr.E.D.Va.1985). *See also In re Alan Wood Steel Co.*, 7 B.R. 697 (Bankr.E.D.Pa. 1980) (holding that bankruptcy court had jurisdiction under § 2(a)(2A), the predecessor to § 505, to adjudicate tax liability of a disbursing agent, but relying on authority holding that court had jurisdiction to determine the tax liability of the debtor without discussing the fact that the tax liability there at issue was not that of the debtor).

Other reported decisions construing § 505(a)(1) were issued in the context of the Internal Revenue Service's efforts to collect unpaid withholding taxes from principals or financing lenders of corporations reorganizing under Chapter 11 of the Bankruptcy Code. *See In re Brandt–Airflex Corp.*, 843 F.2d 90, 95 (2nd Cir.1988) (collecting cases). *See generally* Note, *Bankruptcy Court Jurisdiction and the Power to Enjoin the IRS*, 70 Minn.L.Rev. 1279 (1986). Withholding taxes are required under 11 U.S.C. § 507(a)(7) and § 1129(a)(9)(C) to receive priority treatment in a confirmed plan. However, the IRS often attempts to collect unpaid withholding taxes immediately from corporate principals or financing lenders under 26 U.S.C. § 6672 which makes such parties individually, not derivatively, liable. In response to such efforts, some debtors have moved in bankruptcy court to enjoin the IRS from pursuing its principals, arguing that the financial drain on these parties would severely damage any chance for the corporation to reorganize. A key issue in such cases is whether a bankruptcy court has subject matter jurisdiction over the lawsuit to enjoin the IRS under § 505 when the tax liability at issue is that of a third party, not the debtor.

Early cases under the Bankruptcy Code concluded that bankruptcy courts possessed subject matter jurisdiction in this situation, viewing § 505(a)(1) and 28 U.S.C. § 1471(c) as alternative sources of jurisdiction. *See In re Jon Co.*, 30 B.R. 831, 833 (D.Colo.1983); *In re Original Wild West Foods, Inc.*, 45 B.R. 202, 206 (Bankr.W.D. Tex.1984); *In re H & R Ice Co.*, 24 B.R. 28, 30 (Bankr.W.D.Mo.1982). Those cases followed the construction of § 505 set forth in *In re Major Dynamics, Inc.*, 14 B.R. 969, 972 (Bankr.S.D.Cal.1981). The *Major Dynamics* court acknowledged that the legislative history of § 505 focused on tax obligations of the debtor or the debtor's estate. However, it held that the "any tax" language of § 505(a)(1) must control and "that the Bankruptcy Court has jurisdiction to determine disputes between third party creditors and the IRS in an appropriate case." *Id.* The court explained that an "appropriate case" encompassed "tax disputes of third parties other than the debtor *provided, however,* that the IRS activity to be enjoined directly affected the debtor or the estate, and that the exercise of such jurisdiction was necessary to the rehabilitation of the debtor or the orderly and efficient administration of the debtor's case." *Id.* (emphasis in original).

The *Major Dynamics* line of cases also found jurisdiction under what was characterized as the bankruptcy court's general jurisdiction. *See, e.g., Jon Co.*, 30 B.R. at 833; *Original Wild West Foods*, 45 B.R. at 206. These courts reasoned that IRS efforts against debtor's principals were "related to" the debtor's case under title 11 and therefore subject matter jurisdiction existed under § 1471(c).[6] Unlike § 157 that superceded it, Section 1471(c) vested jurisdiction in bankruptcy courts to enter final judgment in proceedings "related to" a case under Title 11.

The *Major Dynamics* construction of § 505(a)(1) has been rejected in most decisions rendered since the adoption of § 157 in 1984. *See In re Brandt–Airflex Corp.*, 843 F.2d 90, 95 (2nd Cir.1988); *United States v. Huckabee Auto Co.*, 783 F.2d 1546, 1549 (11th Cir.1986); *In re Quattrone Accountants, Inc.*, 100 B.R. 235, 238–39; *In re Success Tool & Mfg. Co.*, 62 B.R. 221, 223 (N.D.Ill.1986); *In re Booth Tow Services, Inc.*, 53 B.R. 1014, 1018

---

**6.** *See supra* note 4.

(W.D.Mo.1985); *In re Morysville Body Works, Inc.*, 89 B.R. 440, 443–45 (Bankr.E. D.Pa.1988); *In re Interstate Motor Freight System*, 62 B.R. 805, 809 (Bankr. W.D.Mich.1986). Each of these cases also involved efforts by the IRS to collect against corporate principals under 26 U.S.C. § 6672. Each court held that the jurisdiction of bankruptcy courts under 11 U.S.C. § 505(a)(1) encompasses only tax liabilities of debtors who have filed for relief under title 11 and does not extend to other parties who are not debtors.[7] The reasoning in *Brandt–Airflex* is the most comprehensive:

> "[T]aken at face value, without recourse to the legislative history, § 505 makes the Bankruptcy Courts a second tax court system, empowering the Bankruptcy Courts to consider 'any tax' whatsoever, on whomsoever imposed."
>
> Section 505(a) was certainly not intended to allow bankruptcy courts to determine the validity of literally *any* tax, no matter who owes it. Moreover, the statute itself says nothing about which classes of non-debtors, if any, could permissibly invoke the bankruptcy court's jurisdiction under § 505(a). A literal reading of the statute, therefore, leads either to unintended results or great uncertainty. As the above quotation suggests, some guidance is found in the legislative history. Section 505(a) is there described as "permit[ting] determination by the bankruptcy court of any unpaid tax liability *of the debtor.*" S.Rep. No. 95–989, 95th Cong., 2d Sess. 67, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5853; H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 356, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6312 (emphasis added). In light of this statement, it makes far more sense to read § 505(a) as

limiting the bankruptcy court's jurisdiction, than to accord it the unrestricted reading favored by *Major Dynamics.*

*Brandt–Airflex*, 843 F.2d at 96, *quoting in part, Interstate Motor Freight*, 62 B.R. at 809 (emphasis in original).

The government Movants argue that the *Brandt–Airflex* line of cases controls the present dispute. They reason that CDA funds held in the name of the Committee and administered by it are held by an entity separate from the Debtor, and that this Court's jurisdiction under § 505(a)(1) does not extend to the taxability of interest earned by this entity.[8] Although not articulated, the argument assumes that because § 505(a)(1) specifically addresses a bankruptcy court's jurisdiction, it preempts and limits the jurisdiction otherwise vested by § 157.

Even assuming *arguendo* that the Committee is a taxable entity separate from the Debtor, that does not mean that its administration of the CDA is separate from the debtor as that concept is used in the *Brandt–Airflex* line of cases. Taxability issues associated with the CDA are within jurisdiction conferred by § 505(a)(1) because the CDA is a crucial component of the Debtor's bankruptcy estate over which this Court has core jurisdiction. As the United States points out, "confirmation of the Plan separated a portion of the corporate assets (which are subject to creditors' claims) from the corporate entity and its remaining assets (which are not subject to the creditors' claims)." Br. for United States at 14. The CDA comprises those assets separated from the Debtor, plus earnings thereon. Once the CDA was funded, the Committee (as Plan administrator) undertook all duties with respect to pre-confirmation liabilities that were not

---

**7.** Neither the court in *Huckabee* nor *Success Tool* (which follows *Huckabee* almost verbatim) states what jurisdictional provision it is interpreting. The Second Circuit in *Brandt–Airflex* assumed *Huckabee* was construing § 505. This reading is consistent with the context.

**8.** The United States cites *In re LaSalle Rolling Mills, Inc.*, 832 F.2d 390 (7th Cir.1987), for the proposition that "the jurisdiction of [this] court is limited to the tax liabilities of debtors who

file petitions for relief under the Bankruptcy Code." United States' Reply Br. at 4. *LaSalle Rolling*, however, holds only that the Tax Anti-Injunction Act precludes the issuance of an injunction enjoining the IRS from pursuing a debtor's principals under 26 U.S.C. § 6672. Indeed, the Seventh Circuit panel specifically stresses that it was not resolving any other jurisdictional question. *Id.* at 392 n. 6.

otherwise assumed by the Debtor or provided for in the Goldblatt Deposit Account. The Committee has since administered the CDA under terms of the Plan. As discussed hereinabove, components of the bankruptcy process—review, contesting, and payment of claims—were conducted through the vehicle of the CDA. Structuring the Plan in this fashion permitted the Committee to commence its duties under the confirmed Plan before all claims against Debtor had been liquidated. The Plan structure does not, however, change the nature of the task left behind or alter this Court's jurisdiction to supervise such activities.

The *Brandt–Airflex* line of cases is not controlling here because a totally different situation was addressed there—one where tax liability of the non-debtor party was independent of the reorganization process. In contrast, the Committee whose tax liability for CDA earnings is at issue here administers the CDA as a product of the reorganization process created to implement certain functions inherent to the bankruptcy process.

■ The legislative history of § 505 does not directly focus on the specific issue before this Court, but that history is certainly not at odds with the conclusion that this Court has jurisdiction under that provision. Some of that legislative history indicates that a bankruptcy court has jurisdiction over tax matters involving both the debtor and the debtor's "estate", while other history refers only to the "debtor". *Compare* 124 Cong.Rec. H11, 110 (daily ed. Sept. 28, 1978), *reprinted in,* 1978 U.S.Code Cong. & Ad.News 5787, 6436, 6490 (statement of Rep. Edwards) ("The House Amendment authorizes the bankruptcy court to rule on the merits of any tax claim involving an unpaid tax, fine, or penalty relating to a tax, or any addition to a tax, *of the debtor or the estate*") (emphasis added), with H.R.Rep. No. 595, 95 Cong., 1st Sess. 356, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6312 (subsections (a) and (b)

"permit determination by the bankruptcy court of any unpaid tax liability *of the debtor ...*"). Given this ambiguity and the amorphous nature of legislative history in general, courts should be reluctant to subscribe to an overly rigid reading of the terms "debtor" and "estate" in that context. Rather, in light of the purpose of § 505, Congressional drafters were referring to the collection of debtor's assets to be used to satisfy its creditors' claims. The CDA operates to do just that and it is certainly part of the bankruptcy "estate".[9] Earnings thereon are part of that estate and taxability thereof may be determined in this Court under § 505 under the rational of *Brandt–Airflex*. The Court therefore holds that the CDA and claims against it and the Committee's operation of it are within the scope of jurisdiction under § 505.

■ This conclusion is supported by its consistency with the core jurisdiction granted under § 157. As the portion of *Brandt–Airflex* quoted above indicates, the issue in construing § 505(a)(1) is how to give proper scope to its broad language which expressly authorizes the bankruptcy court "to determine the amount or legality of *any tax ...*" 11 U.S.C. § 505(a)(1) (emphasis added). Absent a clear contrary articulation of Congressional intent to limit a bankruptcy court's adjudicate authority, the jurisdictional grant over this specific substantive area of law must be read to correspond with the general rules governing the adjudicative powers of bankruptcy courts. Otherwise § 505(a)(1)'s very broad language would actually vest less authority in a bankruptcy court to adjudicate tax matters than would otherwise exist in its absence. Under the Court's holding today, the parameters of a bankruptcy court's jurisdiction over the subject matter of federal and state income taxation under 11 U.S.C. § 505(a)(1) corresponds with general principles governing a bankruptcy court's power to adjudicate at least core matters under 28 U.S.C. § 157.

9. Section 1141(b) states "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." The CDA represents that portion of the estate that was "otherwise provided" for in the Plan.

**530**

The line of cases construing § 505(a)(1) can be viewed as implicitly, if not explicitly, following this approach. Given § 505(a)(1)'s broad language in the light of former § 1471(c), it is likely that Congress intended bankruptcy courts to possess jurisdiction to resolve tax disputes beyond what is authorized under § 157 today. Indeed, the *Major Dynamics* line of cases, prior to adoption of § 157, interpreted the scope of § 505(a)(1) to be broad enough to enter final judgment in what are now "related" proceedings. This view is clearly improper after *Marathon.* Section 157 was passed to address the constitutional problems resulting from an overbroad grant of jurisdiction to bankruptcy courts. Therefore, even if Congress originally intended that a bankruptcy court could enter final orders adjudicating tax proceedings "related to" a case under Title 11 U.S.C., *Marathon* held that the exercise of such jurisdiction would be unconstitutional. Statutes should be construed so as to render them constitutional if that is possible. It is therefore not surprising following *Marathon* and the enactment of § 157 that § 505(a)(1) was interpreted by the *Brandt–Airflex* line of cases as not conferring jurisdiction on bankruptcy courts to enter final judgments in proceedings that earlier cases had characterized as "related to" a case under title 11. Rather, § 505(a)(1) was construed in a manner consistent with the limitations of jurisdiction vested in a bankruptcy court under § 157.

Finding that § 505(a) allows adjudication of tax matters in core proceedings does not render the enactment of § 505 superfluous. Section 505 clearly indicates that taxes as a substantive area of law are not outside the jurisdiction of bankruptcy courts and it carefully spells out certain procedures that may be followed in tax disputes and the proper scope of jurisdiction when the same issue is being litigated contemporaneously in other judicial or administrative forums.

### 2. *Section 505(b)(2)*

■ The United States also contends that even if this Court has subject matter jurisdiction to resolve tax issues related to the CDA, it may not do so until the Committee has complied with 11 U.S.C. § 505(b). This section provides:

A trustee may request a determination of any unpaid liability of the estate for any tax incurred during the administration of the case by submitting a tax return for such tax and a request for such a determination to the governmental unit charged with responsibility for collection or determination of such tax. Unless such return is fraudulent, or contains a material misrepresentation, the trustee, the debtor, and any successor to the debtor are discharged from any liability for such tax-

(1) upon payment of the tax shown on such return, if-

(A) such governmental unit does not notify the trustee, within 60 days after such request, that such return has been selected for examination; or

(B) such governmental unit does not complete such an examination and notify the trustee of any tax due, within 180 days after such request or within such additional time as the court for cause, permits;

(2) upon payment of the tax determined by the court, after notice and a hearing, after completion by such governmental unit of such examination; or

(3) upon payment of the tax determined by such governmental unit to be due.

In summary, the debtor-in-possession or trustee "may" invoke the § 505(b) procedure by filing a tax return. 124 Cong.Rec. at H11110–H11111, *reprinted in* 1978 U.S. Code Cong. & Admin.News at 6493–94 (procedure not "available with respect to any tax liability as to which any return required to be filed on behalf of the estate is not filed with the proper tax authority"). The taxing unit then has 60 days to notify the debtor or trustee that the return has been selected for examination and 180 days to complete the examination (subject to a possible extension for cause). A tax deficiency may be assessed, and a deficiency claim may be presented for resolution by the bankruptcy court. *See generally* 1 King, *Collier on Bankruptcy,* ¶ 8.09[3] at 8–57, 58 (15th ed. 1989).

Two issues are involved in determining the application of § 505(b) to the Committee's declaratory judgment action. First, the Committee argues that it is ineligible to invoke the § 505(b) procedure because the statutory language refers only to "the trustee" (and under § 1107 the debtor-in-possession), and does not mention creditors' committees. The Committee argues that § 505(b) does not encompass an administrator of the bankruptcy estate if that entity is not the debtor-in-possession or a trustee. This is essentially the same argument that Movants advanced and this Court rejected when construing § 505(a)(1).

The Committee's position is at odds with its earlier argument and the holding above that jurisdiction exists under § 505(a)(1). The basis of that ruling was that the CDA and Committee are essential parts of the Debtor's bankruptcy estate within § 505(a)(1), even though the task of administering that account was assigned by confirmed Plan to the Committee so as to facilitate the reorganization.

Second, the United States argues that the Committee *must* comply with the procedures set forth in § 505(b) before this court can adjudicate the controversy because the tax in issue, the federal income tax, is one in which a return must be filed. The United States asserts that the "language [of § 505(b)] indicates a Congressional intent that the procedure provided in § 505(b) be followed in disputes involving any type of tax for which a tax return is required to be filed." U.S. Br. at 10–11. The United States cites *In re Statmaster Corp.*, 465 F.2d 978, 981 (5th Cir.1972) in support of this proposition, quoting the court's statement that "[i]t has always been the clear intention of Congress to prevent the Internal Revenue Service from being forced to litigate tax consequences of returns which have never been filed."

In *Statmaster* the trustee for the bankruptcy estate petitioned the bankruptcy court for a declaratory judgment that no income tax was owed by the estate during its period of liquidation. The trustee had not filed a tax return. The Bankruptcy Referee observed that the failure to adjudicate the tax proceeding would put the trustee at risk for any deficiencies that might be asserted after the case was closed and the estate's assets were disbursed. *In re Statmaster Corp.*, 332 F.Supp. 1248, 1252 (S.D.Fla.1971). The Referee then ruled that the estate owed no taxes. Although the IRS never had an opportunity to audit the estate's return, the referee proceeded to outline a procedure under which a trustee could apply for a determination of the estate's tax liability and the bankruptcy court would allow the IRS an appropriate but accelerated amount of time to conduct an audit. *Id.* at 1262.

The Fifth Circuit held that a bankruptcy court could not enter a declaratory judgment regarding an estate's tax liability. The court reasoned that the jurisdictional grant in § 2(a)(2A) of the Bankruptcy Act, the predecessor to § 505(a)(1), was not an exception to the general rule in 28 U.S.C. § 2201, as then enacted, which prohibited a court from granting declaratory relief in tax matters.[10] The court observed that "[t]hrough the caveat to the Declaratory Judgment Act [prohibiting declaratory relief in tax matters], Congress has clearly indicated that the initial decisions in such cases is for the Commissioner, not the federal courts." *Id.* at 980. The portion of *Statmaster* quoted by the United States is therefore the Fifth Circuit's interpretation of Congressional intent premised in large part on the language of § 2201, as it then existed.[11]

As the United States itself recognizes, however, Congress subsequently amended § 2201 to provide expressly that § 505 ad-

**10.** The Declaratory Judgment Act, 28 U.S.C. § 2201, as then in effect, provided in pertinent part:

In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes,* any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any

interested party seeking such declaration, whether or not further relief is or could be sought. (Emphasis supplied.)

**11.** The Fifth Circuit also discussed, but did not expressly base its holding on a portion of the legislative history to § 2(a)(2A).

judications are an exception to the general rule barring use of declaratory judgment suits to resolve federal tax disputes.[12] Notwithstanding this change in the law, the United States boldly asserts that "§ 505(b) continues the congressional intent that when a tax return is required to be filed for the type of tax in dispute, a trustee desiring a determination of the amount of tax due *must* follow the procedure proscribed by § 505(b)." U.S. Br. at 11. (emphasis added).

Legislative history indicates that the § 505(b) procedure "codifies in part the referee's decision" in *Statmaster.* H.Rep. No. 95–595 at 356, *reprinted in* 1978 U.S. Code Cong. and Admin.News at 6312. It also indicates that the purpose of the subsection is to provide an expedited procedure whereby the estate administrator will be able to obtain protection from potential liability for the estate's taxes that might not otherwise be assessed until after the case is closed. *See* 124 Cong. Rec. at H11110–H11111, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6493–94. *See also* 1 King, *Collier on Bankruptcy* ¶ 8.09[3]. More specifically, § 505(b) often provides a solution to "the trustee's dilemma." *Statmaster,* 332 F.Supp. at 1252. Previously, as the referee's decision in *Statmaster* pointed out, trustees frequently desired to make a final distribution and promptly close the estate, but did so at the risk of being held personally liable for any deficiency the IRS might later assert against the estate after the estate's assets had been irretrievably disbursed. *Id. See also* Plumb, *The Tax Recommendations of the Commission on the Bankruptcy Laws: Tax Procedures,* 88 Harv.L.Rev. 1360, 1423–42 (1975) (cited in H.Rep. No. 95–595 at 356, *reprinted in* 1978 U.S.Code Cong. and Admin.News at 6312).

However, § 505(b) states that "a trustee may request a determination" of the estates' tax liability. Use of the word "may" indicates that it is within the estate administrator's discretion whether to invoke the § 505(b) procedure. What if the estate administrator decides not to utilize § 505(b)? Given that § 505(b) was enacted as a specific solution to the trustee's dilemma, it could be argued that the alternative to following § 505(b) is not to petition the bankruptcy court directly under § 505(a), but rather to be subject to the normal examination procedures of taxing agencies with the risk that assessments might be made much later after the estate was closed.

The latter reasoning is, however, unpersuasive. As discussed earlier, § 505(a)(1) provides in part that a bankruptcy court "may determine the amount or legality of any tax." This general rule is subject to two exceptions enumerated in § 505(a)(2). The first exception is when the tax was litigated and adjudicated before another court, § 505(a)(2)(A). The second exception, § 505(a)(2)(B), prohibits a court from adjudicating the right of an estate to a tax refund unless the trustee has first requested refund from the government authority administering the tax and was refused.[13] Under the latter provision, petitioning of the appropriate government unit is mandatory before a court can exercise jurisdiction. If Congress had intended that filing of a return under § 505(b) was mandatory before a court could assert jurisdiction over tax matters under § 505(a), Congress could and would have added that requirement to § 505(a)(2). It did not. Instead, it made clear that use of § 505(b) was discretionary by providing that it "may" be used.

In addition, the amendment of 28 U.S.C. § 2201 to permit declaratory judgment actions in suits under 11 U.S.C. § 505 was

**12.** The Declaratory Judgment Act, 28 U.S.C. § 2201, now provides:

[I]n a case of actual controversy within its jurisdiction, *except with respect to Federal taxes* other than ... *a proceeding under section 505 ... of title 11,* any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interest party seeking

such declaration, whether or not further relief is or could be sought.

**13.** Section 505(a)(2)(B) provides "[t]he court may not so determine any right of the estate to a tax refund, before the earlier of—(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or (ii) a determination by such governmental unit of such request."

enacted contemporaneously with the enactment of the § 505(b) procedures. Pub.L. 95–598. That amendment to § 2201 did not limit bankruptcy court authority to exercise jurisdiction over declaratory actions to cases where plaintiff has complied with § 505(b).

The § 505(b) procedure involves an examination by the taxing authority that culminates with computation by that authority of the tax owed, much the same as if the tax agency had independently selected and audited the taxpayer and given a notice of deficiency. However, the usual taxpayer who seeks judicial review upon receipt of a notice of deficiency does not seek declaratory judgment to bar any assessment, but rather brings a typical lawsuit to adjudicate the amount of tax liability. *See, e.g., H & H Beverage Distributors v. Department of Revenue of Pennsylvania*, 850 F.2d 165, 167–68 (notice of deficiency permits taxpayer to commence tax court case); 14 Mertens, *Law of Federal Income Taxation* § 50.03 at 50–10 (outlining taxpayer's three litigation alternatives upon receiving a notice of deficiency).

By providing for a series of steps resulting in taxing authority determination of estate tax liability, § 505(b) provides an optional procedure which takes the estate administrator and taxing authority past the point where a dissatisfied estate administrator would usually want to seek declaratory relief. Accordingly, if § 505(b) procedures were an estate administrator's exclusive method for obtaining expedited determination of the estates's income tax liability, there would have been no reason to amend § 2201; § 505(b) would have provided the sole remedy and would not usually have lead to a suit for declaratory relief in the bankruptcy court. The fact that § 2201 was amended to permit declaratory judgments in matters within § 505 suggests that § 505(b) procedures are not exclusive. Otherwise the enactment of the § 505(b) procedures and the contemporaneous amendment of 28 U.S.C. § 2201 would be redundant.

The amendment of § 2201 would of course not be redundant if declaratory relief under § 2201 was only available for tax issues as to which a return is not required.

Under that reasoning, the estate administrator could proceed directly in bankruptcy court for declaratory relief not requiring a return but would have to comply with the § 505(b) procedure for tax issues where a return must be filed. However, the language of § 2201 makes no such distinction. It refers generally to "a proceeding under § 505," and does not refer to § 505(b) as one might expect if the suggested distinction were in fact intended. That is indeed fortunate since the issue of whether a return is required or not may be the crux of a declaratory suit, as it is here.

In summary, there is simply no firm authority to support the argument that failure to invoke § 505(b) precludes this Court from hearing a dispute which is within its jurisdiction under § 505(a)(1).

Section 505(a)(1), however, provides that this Court "may" determine taxes due. Some courts have construed this language as granting the bankruptcy court discretion as to whether to proceed and hear tax disputes or to let such matters proceed through normal tax litigation channels. *See, e.g., H & H Beverage*, 850 F.2d at 167; *In re Diez*, 45 B.R. 137 (Bankr.S.D.Fla. 1984).

This Court has concluded that an estate administrator is not required to comply with § 505(b) before proceeding to have tax liability adjudicated in this forum under § 505(a). However, in the interest of winding up this eight year old estate and paying out whatever is due to creditors as quickly as possible, a condition of this Court's exercise of § 505(a)(1) jurisdiction will be that the Committee file tax returns with each of the respective government Movants reporting all post confirmation earnings in the CDA and presumably reporting its contention that no taxes are due thereon. During the pendency of any examination of those returns, the parties are free to pursue before this Court any appropriate remedy, including cross motions for summary judgment as to the Committee's contention as a matter of law that no tax is due at all. Should the Committee lose on that question, the filing of the returns will expedite the proper assessment of taxes. Should the Committee prevail on its contention of no tax liability, the § 505(b) procedures

**534**

would become moot, except for fleshing out the parameters of claimed tax liabilities in issue. Committee Counsel earlier informed the Court that pro forma returns were drafted though not filed. Therefore this procedure will not require excessive expense or time. Through this procedure, there should be the quickest resolution of all issues raised and rapid final distribution to the Class 3 Allowed Claimants of whatever is due to them. As the government movants have agreed, the Committee here is entitled to follow § 505(b) procedures even though it is not an entity specifically named in that provision.

This opinion is not to be viewed as a ruling on whether the Committee is required to file a return under 26 U.S.C. § 6012(b)(3) or (4) or the analogous state statute. Those issues remain to be decided.

Accordingly, the motions to dismiss will be denied, but this Court will exercise its jurisdiction under § 505(a) only if the Committee files returns under § 505(b) within a short date set by the Court.